UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE   NO.   03-80483-CIV-COOKE
MAGISTRATE JUDGE P. A. WHITE

FRANK RAFAEL ENRIQUEZ,            :

        Plaintiff,              :

v.                               :              REPORT OF
                                        MAGISTRATE JUDGE
KATHLEEN A. KEARNEY, et al.,     :

        Defendants.            :
_____

## I    INTRODUCTION AND BACKGROUND

Plaintiff Frank Rafael Enriquez, a former Florida prisoner, finished serving sentences imposed upon convictions in Miami-Dade County cases 87-0061 and 90-5611, for offenses including sexual battery. Enriquez, now a civil detainee at the Florida Civil Commitment Center ("FCCC") in Arcadia, was previously a civil detainee in a Detainee Unit at South Bay Correctional Facility ("SBDU") until his March 8, 2001 transfer to the FCCC. He filed a pro se civil rights complaint (DE#1) and supplements/amendments (DE#s 6, 60, 129) for declaratory and injunctive relief, and damages, pursuant to 42 U.S.C. §1983, about matters that occurred at the SBDU.

After a Preliminary Report and Order of Partial Dismissal (DE#s 9, 25) various defendants and claims were dismissed. (Among claims dismissed *without prejudice* was "denial of due process in disciplinary proceedings"). At the time, the complaint, as supplemented, was pending against defendants on claims which had been framed, as follows:

    1.   **Excessive Force/Failure to Intervene claim**, brought against defendant officers WOODS, ALLEN, COLEMAN, MAILMAN, GARY and LISS, based on use of force, including pepper spray, against plaintiff at SBDU Quad-2 on the morning of December 22, 2000;

    2.   **Medical Indifference claim**, brought against defendant physicians SCHOCOFF and LIANGCO, based on alleged failure to give proper treatment for plaintiff's back condition at SBDU.

    3.   **Retaliation claim**, brought against defendant officer

PHILLIPS and defendant BELMONTE [plaintiff's former
girlfriend], based on alleged conspiratorial retribution
for plaintiff having brought suit in state court against
Belmonte for slander, which plaintiff claims was shown to
exist because: Phillips [in plaintiff's presence] was
overheard engaging in phone conversations with Belmonte
on July 16 and August 25, 2000, and therein appeared to
empathize with Belmonte; and then, after the August 25
telephone call, Phillips allegedly uttered a verbal
threat ["get the fuck out of my office, or I'll lock your
ass up, you fucking piece of shit sexual predator"]
immediately after Phillips had said to the plaintiff, "I
believe Jody ! You're a stinking predator, and she was
crying on the phone because of your lawsuit."

### *AFTER THE FILING OF THE 2ND AMENDED COMPLAINT, THE PLEADINGS ALSO INCLUDED ADDITIONAL DUE PROCESS CLAIMS:*

   4.   **Confinement without Due Process claim**, brought against
defendant officers ALLEN and COLEMAN, BASED ON placement of
plaintiff on alleged "punitive segregation" [Room Restrict
Status or "RR Status"] on December 22, 2000; **and Confinement
without Due Process claim,** brought against officer PHILLIPS,
BASED ON plaintiff's continued placement on RR Status from
from December 22, 2000, until January 15, 2001.

Following the "Order Adopting Magistrate Judge's Reports and
Recommendations" (i.e., Order DE#184, entered March 5, 2007, adopt-
ing Reports DE#s 152 and 172), pursuant to which a motion to
dismiss by Liss was denied, and a motion to dismiss by Belmonte was
granted, the complaint, as amended (including the latest pleading
DE# 129) remained pending against nine defendants.

The case, then assigned to the Honorable James C. Paine,
United States District Judge, proceeded to summary judgment.
However, after defendants filed motions for summary judgment with
exhibits,[1] and the plaintiff Enriquez filed a response with

---

   [1]   A joint summary judgment motion was entered nine times on the CM/ECF
docket, once for each defendant: at DE# 160 [Allen]; DE# 161 [Coleman]; DE# 162
[Gary]; DE# 163 [Liangco]; DE# 164 [Liss]; DE# 165 [Mailman]; DE# 166 [Phillips];
DE# 167 [Schocoff], and DE# 168 [Woods].   In support of their joint motion, the
defendants submitted: *Exhibit A* [plaintiff's answers to interrogatories]; *Exhibit
B* ["Report/Investigation of Force Used (Detainee Unit)" dated 12/22/2000];
*Exhibit C* [Affidavit of Sergeant Gary]; and *Exhibit D* [a copy of DE# 129,

2

exhibits,[2] Enriquez filed a notice of interlocutory appeal (DE#187), and a motion for leave to proceed in forma pauperis on appeal (DE#189) which was granted (DE#192). The docket thereafter showed the case as closed, and the defendants' summary judgment motions (see footnote 1, supra) were not reflected on the CM/ECF docket as pending motions. Subsequently, the closed case was reassigned to the Honorable Marcia G. Cooke, United States District Judge, it was reopened, and the defendants were granted leave to renew their motions for summary judgment (see DE#s 200, 205, 207).

**This Cause is now before the Court upon a joint renewed motion for summary judgment (DE#217) by defendants ALLEN, PHILLIPS, MAILMAN, GARY, WOODS, LISS, COLEMAN, LIANGCO and SCHOCOFF,** with Exhibits A-D (filed at DE#s 217-2 to 217-5), as to which Plaintiff Enriquez was advised of his right to Respond (see Order of Instructions, DE#219).[3] In opposition, Enriquez filed a "Renewed

---

plaintiff's Second Amended Complaint].

[2]     Plaintiff Enriquez, as a *pro se* litigant was informed of his right to respond to the defendants' motion for summary judgment, and was instructed about requirements of Fed.R.Civ.P. 56 for a response to such a motion (see Orders, DE#s 171, 174). Enriquez filed a Response (docketed at DE# 175) consisting of his own Declaration, with *Exhibits A through D* attached.

[3]     Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper

> [i]f the pleadings, depositions, answers to interroga-
> tories, and admissions on file, together with the
> affidavits, if any, show that there is no genuine issue
> as to any material fact, and that the moving party is
> entitled to judgment as a matter of law.

In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that summary judgment should be entered only against

> a party who fails to make a showing sufficient to
> establish the existence of an element essential to that
> party's case, and on which that party will bear the
> burden of proof at trial.  In such a situation, there
> can be 'no genuine issue as to any material fact,' since
> a complete failure of proof concerning an essential
> element of the non-moving party's case necessarily ren-
> ders all other facts immaterial. The moving party is
> 'entitled to judgment as a matter of law' because the
> non-moving party has failed to make a sufficient showing
> on an essential element of her case with respect to
> which she has the burden of proof.  (citations omitted)

Declaration" (DE#221 at pp.1-8 -- incorporating by reference his prior Declaration and Exhibits filed earlier at DE#175)[4], a Brief (DE#221 at pp.9-16), and Composite "Exhibit A" (DE#221 at pp. 17-30).[5]  The defendants filed no Reply.

In defendants' joint renewed motion, the following claims are addressed: 1) Use of Force on 12/22/2000 [a claim raised against

---

Thus, in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that summary judgment should be entered only against a party who fails to make a show-ing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.  The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. (citations omitted). Thus, pursuant to Celotex and its progeny, a movant for summary judgment bears the initial re-sponsibility of informing the court of the basis for his motion by identifying those parts of the record that demonstrate the nonexistence of a genuine issue of material fact. This demonstration need not be accompanied by affidavits. Hoffman v. Allied Corp., 912 F.2d 1379, 1382 (11 Cir.1990).If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genu-ine issue of material fact, the burden then shifts to the nonmoving party, to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. Avirgan v. Hull, 932 F.2d 1572, 1577 (11 Cir.), cert. denied, 112 S.Ct. 913 (1992). It is the nonmoving party's burden to come forward with evidence on each essential element of his claim sufficient to sustain a jury verdict. Earley v. Champion International Corp., 907 F.2d 1077, 1080 11 Cir.1990). The non-moving party cannot rely solely on his complaint and other initial pleadings to contest a motion for summary judgment supported by evidentiary material, but must respond with affidavits, depositions, or otherwise to show that there are material issues of fact which require a trial Fed.R.Civ.P. 56(e); Coleman v. Smith, 828 F.2d 714, 717 (11 Cir.1987). If the evidence pre-sented by the nonmoving party is merely colorable, or is not significantly proba-tive, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Baldwin County, Alabama v. Purcell Corp., 971 F.2d 1558 (11 Cir.1992). "A mere 'scintilla' of evidence supporting the opposing party's posi-tion will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11 Cir. 1990) (citing Anderson v. Liberty Lobby, Inc., supra).

Pursuant to Brown v. Shinbaum, 828 F.2d 707 (11 Cir. 1987), the Order of Instructions to Pro Se Plaintiff Concerning Response to Motion for Summary Judg-ment (DE#219) was entered to inform the pro se plaintiff of his right to respond to the defendants' renewed motion for summary judgment, and instruct him regard-ing requirements under Fed.R.Civ.P. 56 for a proper response to such a motion.

[4]     The incorporation by reference is at DE#221, p.6, ¶32.

[5]     Enriquez's "Renewed Declaration," Brief, and Exhibits were filed in duplicate at DE#s 222 and 223).

WOODS, ALLEN, COLEMAN, MAILMAN, GARY, and LISS][6]; 2) Inadequate Medical care [a claim raised against LIANGCO and SCHOCOFF]; and 3) Retaliation [as to PHILLIPS]. In their Motion(s) for Summary Judgment, the defendants did not separately address, in terms of Denial of Due Process, plaintiff's allegations [against Allen and Coleman] about his 12/22/2000 confinement on RR Status, or plaintiff's allegations [against Phillips] about his placement and continuation  on RR Status from 12/22/2000 to 1/15/2001.

Defendants' Exhibits are: *Exhibit A* [plaintiff's answers to interrogatories]; *Exhibit B* ["Report/Investigation of Force Used (Detainee Unit)" dated 12/22/2000]; *Exhibit C* [Affidavit of Sergeant Gary]; and *Exhibit D* [a copy of DE#129, plaintiff's Second Amended Complaint].

Enriquez's Opposition consists of: 1) his Renewed Declaration, Brief, and Composite Exhibit A [all filed at DE#221]; and 2) his prior Declaration [DE#175, pp.1-16], with: *Exhibit A* [an incomplete copy of the 12/22/2000 "Report/Investigation of Force Used (Detainee Unit)" submitted as defendants' Ex.B] (at DE#175, pp.17-33); *Exhibit B* [a composite exhibit consisting of medical records generated between March 2000 and July 2001, as well as affidavits executed 12/27/2000 by Drs. Liangco and Schocoff, pertaining to diagnosis and the course of treatment for Enriquez's back condition (at DE#175 pp.33-60, and DE#175-1 pp.1-12); *Exhibit C* [a composite exhibit consisting of: requests and complaints ("Detainee Request/Complaint" forms) written by Enriquez between 12/27/99 and 2/22/01, with Responses from SBDU staff; and copies of a March 1, 2001 "Motion to Transfer Respondent to Arcadia" and a March 2, 2001 state Court "Order to Transfer," recommending that the DCF transfer Enriquez from the SBDU to the Detainee Unit in Arcadia (at DE#175-1 pp.13-26); and *Exhibit D* [a composite exhibit consisting of Affidavits from 4 SBDU detainees (Hayes, Marcum, Alicea and Troville) about their observation of events on SBDU Quad-2 on the morning of

---

[6]     Although Coleman is listed as a movant (DE#217, pp.1 and 7), his name was omitted from defendants' discussion of the use of force claim, perhaps due to clerical oversight (see DE#217, at p.2, ¶7).

12/22/2000; and a copy of the Contract between Florida's Department of Children and Family Services ("DCF") and Wackenhut Corporation, for operation of a secure custody Civil Commitment Unit at South Bay, for the period 7/1/2000 to 6/30/2001, as a result of the "'Jimmy Ryce Involuntary Civil Commitment for Sexually Violent Predators' Treatment and Care Act' contained within ss.394.910-394.931, Florida Statutes" (at DE#175-1 pp.27-61).

## II   DISCUSSION

One of the basic guarantees under the Due Process Clause is that the States' ability to punish is predicated on the existence of an adjudication of guilt. See Bell v. Wolfish, 441 U.S. 520, 533, 535, n. 16 (1979); DeShaney v. Winnebago County Dept. Of Soc. Servs., 489 U.S. 189, 199 n. 6 (1989)("the State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law") (quoting Ingraham v. Wright, 430 U.S. 651, 671-72, n. 40 (1977).

The Supreme Court, in Youngberg v. Romeo, 457 U.S. 307 (1982), held that "persons who have been involuntarily committed are enti-tled to more consideration treatment and conditions than criminals whose conditions of confinement are designed to punish." Id., 457 U.S. at 322. This, however, does not mean that a person so detained and confined is free to live within his/her designated institution without restrictions or limitations. Neither pretrial detainees facing charges, detainees in mental hospitals, nor persons confined as Sexually Violent Predators ("SVPs") are in the same position as a free individual in the outside world; and, although they may unhappy having to accommodate themselves to rules, restrictions, and orders given in the institution, imposition of the same upon them does not necessarily render such things punishment.[7]

---

[7]      The Court in Bell v. Wolfish, observed this point, stating, in pertinent part, as follows:

> Once the Government has exercised its conceded authority to detain a person...it obviously is entitled to employ devices that are calculated to effectuate this detention. Traditionally, this has meant confinement in a facility which, no matter how modern or how

The Supreme Court noted in <u>Youngberg</u> that "we have upheld those restrictions on liberty that were reasonably related to legitimate government objectives and not tantamount to punishment" (citing <u>Bell</u>, <u>supra</u>, at 539). The Court also noted, in <u>Youngberg</u>, that when balancing legitimate interests of the State and the rights of the involuntarily committed, what is required by the Constitution is "that the courts make certain that professional judgment in fact was exercised," <u>Id.</u> 457 U.S. at 321. In balancing detainees' rights against legitimate institutional needs, the courts engage in limited judicial review of state institutional conditions, to the extent that deference is granted to the judgment of those who are charged with day to day operation of the institution. <u>See Youngberg</u>, <u>supra</u>, 457 U.S. at 322 ("By so limiting judicial review of challenges to conditions in state institutions, interference by the federal judiciary with the internal operations of these institutions should be minimized"), and <u>see Youngberg</u>, <u>supra</u>, at 322-23 ("Moreover, there certainly is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions") (citing <u>Parham v. J.R.</u>, 442 U.S. 584, 607 (1979) and quoting <u>Bell v. Wolfish</u>, <u>supra</u>, 441 U.S. at 544 (Courts should not "'second-guess the expert administrators on matters on which they are better informed'")).[8] Such deference is

---

antiquated, results in restricting the movement of a detainee in a manner in which he would not be restricted if he simply were free to walk the streets pending trial. Whether it be called a jail, a prison, or a custodial center, the purpose of the facility is to detain. Loss of freedom of choice and privacy are inherent incidents of confinement in such a facility. And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into "punishment."

<u>Bell v. Wolfish</u>, 441 U.S. 520, 537 (1979).

[8]     In relation to its discussion about minimization of judicial interference in internal operations of institutions, when courts are charged with deciding with deciding wether the involuntarily committed person was subjected to reasonable conditions of safety and freedom, and whether any restraints imposed were reasonable or unreasonable, the Supreme Court, at footnote of its opinion in <u>Youngberg</u>, cited four of its prior opinions, as follows:

See <u>Parham v. J. R.</u>, 442 U.S. 584, 608, n. 16, 99 S.Ct. 2493, 2507, n. 16, 61 L.Ed.2d 101 (In limiting judicial review of medical decisions made by professionals, "it is incumbent on courts to

to be afforded to institutional officials, both in the context of prisons, where the persons detained have been convicted, and also in the context of pretrial detention, where they have not. Bell, 441 U.S. at 547, n.29.

Key, among legitimate governmental interests to be balanced against constitutional rights which detainees (or prisoners), is the need to maintain institutional order and security. See Bell v. Wolfish, 441 U.S. 520, 550-51, n.32 (1979) [in context of pretrial detention] ("Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee...the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security," and "[prison/institutional] administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security");[9] Pell v. Procunier, 417 U.S. 817, 822-23

design procedures that protect the rights of the individual without unduly burdening the legitimate efforts of the states to deal with difficult social problems"). See also Rhodes v. Chapman, 452 U.S. 337, 352, 101 S.Ct. 2392, 2402, 69 L.Ed.2d 59 (1981) ("[C]ourts cannot assume that state legislatures and prison officials are insensitive to the requirements of the Constitution or to the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system ..."); Bell v. Wolfish, 441 U.S. 520, 539, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979) (In the context of conditions of confinement of pretrial detainees, "[c]ourts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility"); Wolff v. McDonnell, 418 U.S. 539, 556, 94 S.Ct. 2963, 2974-2975, 41 L.Ed.2d 935 (1974) (In considering a procedural due process claim in the context of prison, "there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application"). See also Townsend & Mattson, The Interaction of Law and Special Education: Observing the Emperor's New Clothes, 1 Analysis and Intervention in Developmental Disabilities 75 (1981) (judicial resolution of rights of the handicapped can have adverse as well as positive effects on social change).

Youngberg, supra, 457 U.S. at 322, n.29

[9]     As part of its discussion of deference to decisions of institutional officials, and recognition that such officials must sometimes react quickly, and sometimes take preventative measures, the Supreme Court, at footnote 32 of its opinion in Bell v. Wolfish, quoted from its earlier

(1974) [in the prison context] ("finally, central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves").

## A.  <u>Use of Force</u>

It is well settled that detainees not convicted can sue for acts of violence by prison/jail officials.[10] <u>See</u>: <u>Johnson v. Glick</u>, 481 F.2d 1028, 1033 (2 Cir.), <u>cert. denied</u>, 414 U.S. 1033 (1973) [§1983 action; state detainee's claim measured in opinion by Judge Friendly under standard balancing 1) the need for application of the force, 2) the relationship between the need and the amount of force that was used, 3) the extent of the injury inflicted, and 4) whether force was applied in a good faith effort to maintain or restore discipline or "maliciously and sadistically for the very purpose of causing harm."]; <u>H.C. By Hewett v. Jarrad</u>, 786 F.2d 1080 (11 Cir. 1986) [§1983 action; juvenile state pretrial detainee];

---

decisions in <u>Jones v. North Carolina Prisoners' Labor Union</u>, 433 U.S. 119, 132-33 (1974), and <u>Pell v. Procunier</u>, 417 U.S. 817, 825 (1974).

That portion of the <u>Bell</u> Opinion reads, in part, as follows:

[In Jones]..."we stated: "Responsible prison officials must be permitted to take reasonable steps to forestall . . . threat[s to security], and they must be permitted to act before the time when they can compile a dossier on the eve of a riot."

<u>Bell</u>, <u>supra</u>, at n. 32, (quoting <u>Jones</u>, <u>supra</u>, 433 U.S. at 132-33).

In *Jones*, we also emphasized that the "informed discretion of prison officials that there is *potential* danger may be sufficient for limiting rights even though this showing might be 'unimpressive if . . . submitted as justification for governmental restriction of personal communication among members of the general public.' " (Emphasis added.) <u>Id.</u>, at 133 n. 9, quoting <u>Pell v. Procunier</u>, 417 U.S., at 825...

<u>Bell</u>, <u>supra</u>, at n. 32, (quoting <u>Jones</u>, <u>supra</u>, 433 U.S. at 133, in turn, quoting <u>Pell</u>)

[10]     When a plaintiff was a pretrial detainee at the time of the events alleged in his complaint, and not a convicted prisoner, his claims which would lie under the Eighth Amendment prohibition against cruel and unusual punishment if he had been a convicted prisoner, arise instead from the Due Process Clause of the Fourteenth Amendment. <u>See</u>: <u>Bell v. Wolfish</u>, 411 U.S. 520, 535 (1979); <u>Hamm v. DeKalb County</u>, 774 F.2d 1567, 1574 (11 Cir. 1985);  <u>Redman v. County of San Diego</u>, 896 F.2d 362, 364-66 (9 Cir. 1990); <u>H.C. By Hewett v. Jarrad</u>, <u>supra</u>; and <u>Telfair v. Gilberg</u>, <u>supra</u>.

<u>Telfair v. Gilberg</u>, 868 F.Supp. 1396 (S.D.Ga. 1994) [§1983 action;
adult state pretrial detainee].[11] It is not necessary for
institutional/jail officials to actually participate in a use of
excessive force in order to be held liable under §1983, if they are
present at the scene and fail to take steps to protect a victim
from a fellow officer's use of excessive force, <u>see</u> <u>Harris v.
Chanclor</u>, 537 F.2d 203, 205-6 (5 Cir. 1976) (prison official's
failure to intervene).

Careful review of the evidence in this case submitted through
exhibits, including those offered by the plaintiff and the defen-
dants, reveals that the series of events culminating in the use of
pepper spray against Enriquez occurred between approximately 7:30
and 9:00 a.m., on December 22, 2000. The exhibits [including affida-
vits of detainees Hayes, Marcum, Alicea and Troville; and the
"Report/Investigation of Force" incorporating affidavits of officers
Mailman, Liss, and Woods, and Incident Reports by Woods, Allen, and

---

[11]    Courts have diverged on the question of the precise standard that is
to be used to review Fourteenth Amendment excessive use of force claims by
detainees in general. <u>See</u>: <u>Wilson v. Williams</u>, 83 F.3d 870, 874-77 (7 Cir. 1996),
and cases cited therein.

In 1986, the Eleventh Circuit in <u>H.C. By Hewett</u>, <u>supra</u>, observing that the
Due Process Clause of the Fourteenth Amendment forbids punishment of pretrial
detainees, applied Judge Friendly's four part substantive due process analysis
from <u>Johnson v. Glick</u>, <u>supra</u>, to a claim that a battery committed by the
Superintendent at a Florida HRS juvenile detention center violated the detainee's
constitutional rights. <u>H.C. By Hewett</u>, <u>supra</u>, at 1085. The Eleventh Circuit also
has applied the same standard (the four part Friendly analysis) in other contexts
where the use of excessive force was alleged, for example, <u>O'Neal v. DeKalb
County</u>, 850 F.2d 653, 654-55 (11 Cir. 1988), a §1983 action under the Fourteenth
and Fourth Amendments against two policemen involved in shooting incident.

Later, in 1994, in a case involving a claim of excessive force against a
state pretrial detainee, a Court from this Circuit, the District Court for the
Southern District of Georgia, engaged in a lengthy analysis of the distinctions
between claims of excessive force raised by convicted prisoners, and similar
claims by persons merely detained. The Georgia District Court suggested that an
intermediate "revised standard" might be applied to a pretrial detainee's
Fourteenth Amendment claim of excessive force. Under the proposed revised
standard most of Judge Friendly's requirements in <u>Johnson</u> would be retained,
except that which requires a showing of "malicious or sadistic intent." The
proposed "revised" test would in the Court's words allow "proof under a lower,
circumstantial standard." Under this "revised" standard the court would first
search for evidence of intent to punish the detainee. Then, if there is no direct
evidence of intent, the court would determine 1) whether a legitimate interest
in the use of force is evident from the circumstances, and 2) if so, whether the
force used was necessary to further that interest. <u>Telfair v. Gilberg</u>, 868
F.Supp. 1396, 1404-1412 (S.D.Ga. 1994).

Coleman] show the following.

　　At about 7:25 a.m., a head Count was being conducted by Officer Woods on Quad-2. Enriquez engaged in an oral confrontation with Woods, in which verbal abuse was directed towards Woods. [The record suggests that the exchange had something to do with Woods some days earlier refusing to allow Enriquez's attorney to buy him a soda. See Enriquez's 12/20/00 Detainee Request/Complaint, and Officer Phillips' 12/23/00 Response, at DE# 175-1, p.18 of 61]. Enriquez ignored oral requests to calm down. Detainees Alicea and Troville [in identical affidavits] state that "a situation had occurred where the correctional staff of [the SBDU], were advising all detainees to return to their cells for lock down," that one staff member "very rudely interrupted detainee Enriquez while he was on the phone to tell him to go back to his cell," and that Enriquez refused to hang up, stating that he was on the phone with his attorney. They state that the officer became loud and persistent, insisting that Enriquez return to his cell, and that Enriquez "finally hung up the phone," but only after other officers "approached the situation and began to verbally harass and threaten detainee Enriquez." Detainees Alicea and Troville state in their affidavits that Enriquez, "in protest to the abusive attitude and behavior of the officers sat down in a chair and refused to move until a higher ranking officer arrived." Alicea and Troville also state that officer Coleman later arrived, and state that "[he] was talking to detainee Enriquez and without provocation, Lt. Coleman sprayed detainee Enriquez in the face with whatever was in the can" [mace/pepper spray]. Alicea and Troville further state that Enriquez reflexively protected his face with his hands, and that the officers "rushed him, grabbed him, and threw him to the floor, putting their knees in his back and pushing his face into the floor." Enriquez was then handcuffed and removed from Quad-2. Officer affidavits and Incident Reports attached to the "Report/Investigation of Force" include Woods' affidavit stating that after his initial encounter with Enriquez he "ordered Enriquez out of Wing 2 and instructed him to follow me to Wing 4 for time-out so that he could calm down due to the fact that he was disturbing other detainees and was being disrespectful," that when Enriquez

refused to go, he [Woods] exited Wing 2 to advise other officers of the situation, and that Enriquez continued to refuse, even after orders to leave were given by others. Detainee Hayes' affidavit indicates that at 8:40 a.m. [about an hour after the initial encounter with Woods] Enriquez was still on Quad-2, that "an obvious disturbance was taking place," that he saw Enriquez surrounded by officers, and that "it was obvious that conversation was taking place." He continued to watch, and finally, at about 8:54 a.m., officer Coleman raised a can of mace or pepper gas, and sprayed Enriquez in the face. This occurred while Enriquez sat in a chair, showing no physical aggression or resistance. Detainee Hayes observed that at about 8:57 a.m., Enriquez was escorted to Quad-4.

The officers' affidavits and incident reports indicate that after initial, futile use of verbal orders [about 7:30 a.m.] for Enriquez to leave Quad-2 [intended as a "time out" to allow him to calm down], the matter escalated. It was only when more than an hour had passed, and Enriquez remained seated in Quad-2, that officers resorted to use of pepper spray, at approximately 8:50 a.m. [Officer Coleman's Report says 8:48 a.m.; Detainee Hayes states 8:54 a.m.]. By the end of the incident, Enriquez's removal from Quad-2 to Quad-4 had progressed beyond a "time out" for him to calm down, and was for placement on "RR" Status (Room Restriction). The "Report of Room Restriction" of record, dated 12/22/00 at 9:15 a.m., issued by Captain Allen, and later approved by Unit Manager Tammy Phillips on 12/23/00, indicates, as follows, under the heading "Reviewing Authority Action":

> Appropriate action taken. Detainee Enriquez carried the situation too far and threatened the secure operation of the unit.  He will remain on RR Status until his behavior is under control and he is no longer a threat to security.

(See DE#217-4; DE# 175 at p.29 of 60). The record reveals that following the use of force [application of mace, handcuffing, and escort from Quad-2], Enriquez was taken to the shower for decontamination at about 8:53 a.m., and that thereafter he was taken to Room 209 where he refused medical treatment by Nurse Pinkney at

about 10:55 a.m.  (<u>See</u>: Officer Gary's Affidavit, at DE#217-4, ¶11;
"Report/Investigation of Force Used," DE#217-3 at p.1 of 17;
Incident Report, DE#217-3 at p.15 of 17).  The Record further
indicates that before resorting to the use of pepper spray against
Enriquez, the medical department had been consulted. (<u>See</u> Gary
Affidavit, at ¶10, stating "Mr. Enriquez was cleared for the use of
chemical agents prior to its use by the medical department;" <u>See</u>
Coleman's Incident Report, DE#217-3 at p. 14 of 17, stating that "At
08:45 Hours Medical Department Advised that Chemical Agent (Aerosol
Pepper Spray) could be used". The plaintiff has asserted that the
application of pepper spray consisted of three bursts; and the
defendants' exhibits suggest that its use consisted of one burst.
There is no evidence of record to substantiate that, apart from
temporary discomfort from effects of the pepper spray, the plaintiff
sustained any serious or lasting injury from its use; nor is there
any medical evidence of record to indicate any such injury occurred
as a result of such force as was used to handcuff and escort
Enriquez from Quad-2 after the pepper spray was applied.

Courts have held that even simple inmate recalcitrance, in the
form of refusal of verbal orders, may justify the use of tear
gas/pepper spray/mace-like agents, in non-dangerous amounts, to
obtain inmate compliance so as to maintain institutional Order, even
when the inmate is in handcuffs, or locked in his cell when the
chemical agent is used. <u>See</u> <u>Danley v. Allen</u>, 540 F.3d 1298, 1307 (11
Cir. 2008)(citing <u>Jones v. Shields</u>, 207 F.3d 491, 496 (8 Cir.
2000)(citing cases); <u>Williams v. Benjamin</u>, 77 F.3d 756, 762-63 (4
Cir. 1996); <u>Soto v. Dickey</u>, 744 F.2d 1260, 1270-71 (7 Cir. 1984);
<u>Spain v. Procunier</u>, 600 F.2d 189, 195 (9 Cir. 1979); <u>Williams v.
Scott</u>, No. 96-2184, 1997 WL 312273, at *1 (7 Cir., June 5, 1997);
<u>Barr v. Williamsburg Co. Sheriff's Dept.</u>, No. C/A2:02-0167-22AJ,
2002 WL 32333152, at *4-5 (D.S.C., Dec. 27, 2002). <u>But</u> <u>see</u> <u>Vinyard
v. Wilson</u>, 311 F.3d 1340, 1348-49, n.13 (11 Cir. 2002)(Eleventh
Circuit, reviewing its own decisions where force and injury were
held to be <i>de minimis</i> and not excessive, and affirming summary judg-
ment for defendant police officer Stanfield as to uses of force
against Vinyard at an arrest scene, and after arrival at the police

station, and as to any resulting injuries at those two points; but reversing, in part, the district court's judgment which had granted summary judgment to officer Stanfield with regard to force used against Vinyard during the ride to jail [when Stanfield stopped the police vehicle en route, grabbed Vinyard causing bruising of her harm and breast, and sprayed her with mace in order to try to stop the intoxicated arrestee Vinyard from screaming obscenities and insults], finding that although there existed "a strong argument" that the act of grabbing and bruising Vinyard constituted *de minimis* force and injury, "[w]hat distinguishes Stanfield's force during the jail ride from the *de minimis* force and injury cases is the use of pepper spray").

In the present case, the record indicates that the need for use of force arose only after Enriquez's behavior was perceived by officers as presenting a threat to the order and security on the unit. It is apparent from the record that the force used against him was applied in good faith to further the need to maintain order and security on a detention unit where numerous SVPs were being held. Despite Enriquez's contentions that he did nothing, and was simply remaining seated without physical threat to officers, and that the use of pepper spray against him was unlawful, it is clear that the force used was not applied as punishment. Rather, it was only after protracted attempts [of more than 1 hour] to verbally convince him to cooperate, and leave the unit where his interaction with officers was causing disturbance, that the decision to use a chemical agent finally was made. Other than Enriquez's own unsupported conclusions, there is nothing of record to indicate that the force used against him was for the impermissible purpose of inflicting punishment. The record further reflects that the officers involved sought to use a minimum amount of force necessary under the circumstances. Instead of choosing body-to-body contact as a first resort, which could possibly have resulted in physical injuries to officers and/or the plaintiff if he resisted, a decision was made to commence with a minimal amount of force in the form of pepper spray. Finally, the record contains nothing to show that the plaintiff sustained any serious injury as a result of any force used against him on the day

14

in question [pepper spray; handcuffing; or escorting him from the unit in restraints].

In short, regardless of whether the force used against Enriquez is measured under the four part analysis from Judge Friendly's 1973 seminal opinion from the Second Circuit in <u>Johnson v. Glick</u>, <u>supra</u>, adopted in Eleventh Circuit cases, <u>see</u>: <u>H.C. By Hewett</u>, and <u>O'Neil</u>, <u>supra</u>, or is measured under an alternative standard such as the "revised standard" proposed by the District Court for the Southern District of Georgia in <u>Telfair</u> in 1994, it is apparent that defendant Coleman's use of pepper spray did not rise to a constitutional level, and it follows, therefore, that his fellow officers cannot be held liable on a theory of failure to intervene.

## B.  <u>Alleged Medical Indifference</u>

Whether an inmate/detainee's medical need requires attention as a matter of constitutional right depends upon its severity. Jail/detention facility officials violate a detainee's Constitutional rights under the Fourteenth Amendment if they withhold appropriate medical care with deliberate indifference to the inmate's serious medical needs. <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976). Negligence is not enough, <u>Estelle</u>, <u>supra</u>, at 104-06. To prevail on such a claim, the detainee must establish: 1) an "objectively serious deprivation," i.e. a serious medical need accompanied by a substantial risk of serious harm if unattended; 2) a response by public officials beyond negligence, i.e., one that is so inadequate as to constitute and "unnecessary and wanton infliction of pain;" and 3) an attitude of deliberate indifference, which shows that the defendants were aware of the facts from which a substantial risk of serious harm could be inferred, and that they actually did draw that inference. <u>Taylor v. Adams</u>, 221 F.3d 1254, 1258 (11 Cir. 2002). The standard may be met where there is a showing that jail officials denied or delayed an inmate from receiving necessary medical treatment for non-medical reasons, <u>see Ancata v. Prison Health Services, Inc.</u>, 769 F.2d 700, 704 (11 Cir. 1985). In addition, officials' inordinate delay in providing necessary treatment, without medical explanation, may evidence deliberate indifference, <u>Farrow v. West</u>,

320 F.3d 1235, 1247 (11 Cir. 2003), and the standard may be met where there is intentional, unexplained delay in providing access treatment for serious painful injuries, of which the defendant is aware, or the existence of which should be readily apparent to the defendant. Brown v. Hughes, 894 F.2d 1533 (11 Cir. 1990), and cases cited therein. Negligence is not enough, see Estelle, supra, at 104-06,[12] and a mere difference of opinion between an inmate/detainee and jail/prison/institutional medical staff concerning his diagnosis and course of treatment (including decisions concerning x-rays and CT or MRI scans, or surgery) does not rise to the level of a constitutional deprivation; nor does a difference of opinion among medical personnel over questions of treatment give rise to a constitutional claim.[13]

---

[12]    For medical claims the standard is met only where egregious conduct is present, as in instances where the prisoner is subjected to repeated examples of delayed, denied, or grossly incompetent or inadequate medical care; prison personnel fail to respond to a known medical problem; or prison doctors take the easier and less efficacious route in treating an inmate. See, e.g., Waldrop v. Evans, 871 F.2d 1030, 1033 (11 Cir. 1989) (summary judgment precluded where cessation of anti-psychotic medication resulted in repeated suicide attempts and self-mutilation); Rogers v. Evans, 792 F.2d 1052, 1058-59 (11 Cir. 1986) (suicide following misdiagnosis and mistreatment of psychosis). On the other hand, it is well settled that a showing of mere negligence, neglect, or medical malpractice is insufficient to recover on a §1983 claim. A showing of conscious or callous indifference is required. Estelle v. Gamble, supra, 429 U.S. at 104-06; Daniels v. Williams, 474 U.S. 327 (1986); Brown v. Hughes, 894 F.2d 1533, 1537-38 (11 Cir. 1990); Washington v. Dugger, 860 F.2d 1018, 1021 (11 Cir. 1988).

[13]    The Courts have long recognized that a difference of opinion between an inmate/detainee and jail/prison/institutional medical staff regarding medical matters, including the diagnosis or treatment which the inmate/detainee receives, cannot in itself rise to the level of a cause of action for cruel and unusual punishment, and have consistently held that the propriety of a certain course of medical treatment is not a proper subject for review in a civil rights action. Estelle v. Gamble, supra, at 107 (holding that "matter[s] of medical judgment" do not give rise to a §1983 claim; and upon reinstating a district Court's dismissal of a complaint which alleged that "more should have been done" to diagnose and treat a back injury, the Court stated that "A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice"). See: Ledoux v. Davies, 961 F.2d 1536 (10 Cir. 1992) (inmate's claim he was denied medication was contradicted by his own statement, and inmate's belief that he needed additional medication other than that prescribed by treating physician was insufficient to establish constitutional violation); Ramos v. Lamm, 639 F.2d 559, 575 (10 Cir. 1980) (difference of opinion between inmate and prison medical staff regarding treatment or diagnosis does not itself state a constitutional violation), cert. denied, 450 U.S. 1041 (1981); Smart v. Villar, 547 F.2d 112, 114 (10 Cir. 1976) (same); Burns v. Head Jailor of LaSalle County Jail, 576 F.Supp. 618, 620 (N.D. Ill., E.D. 1984)(exercise of prison doctor's professional judgment to discontinue pre-

In this case, careful review of record (specifically, plaintiff's _Exhibit B_ at DE#175 [a composite exhibit consisting of medical records generated between March 2000 and July 2001, as well as affidavits executed 12/27/2000 by Drs. Liangco and Schocoff, pertaining to diagnosis and the course of treatment for Enriquez's back condition] show that when they had contact with and evaluated him for his back condition, they prescribed medication for pain, but found no indication of need for MRIs. See Liangco Affidavit dated 12/27/00 for submission in state Court, and See: Examination Notes by Liangco, dated 12/13/00 -- indicating plaintiff was seen several times for complaints about sciatica; that the doctors' examinations did not show difficulty in range of motion, that he sometimes sat comfortably during examination, that his gate was observed to be normal, with no deformity, that there was no evidence of weakness in upper and lower extremities, that his coordination was good, and sitting and standing movements were observed to be normal. See also Schocoff Affidavit, dated 12/27/00 for submission in state Court, stating that based on his 12/12/00 examination of Enriquez, it was his opinion, within a reasonable degree of medical probability, that he was not a candidate for an MRI of the lumbar spine at that time.

---

scription for certain drugs not actionable under §1983); Westlake v. Lucas, 537 F.2d 587, 860 n.5 (6 Cir. 1976) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law"); Alexander v. Federal Bureau of Prisons, 227 F.Supp.2d 657, 666-667 (E.D.Ky. 2002) (dismissing complaint, which amounted to difference of opinion between prisoner and health care providers concerning surgery for knee injury); Moraga v. Kaiser, 28 F.3d 107 (Table Case), No. 93-16911, 1994 WL 247093 at *2 (9 Cir. June 8, 1994) (affirming summary judgment for prison doctors, even though reconstructive surgery had been twice recommended, and was still being delayed after 16 months); Taylor v. Dutton, 85 F.3d 632 (Table Case), No. 95-3964, 1996 WL 253856 at *2 (7 Cir. May 7, 1996) (were one physician recommended surgery, but two others subsequently did not share that recommendation, the mere differences of opinion between medical personnel did not give rise to an 8th Amendment violation; and to the extent that Taylor's claim was based on his own disagreement with medical staff about his medical treatment, the complaint did not amount to deliberate indifference); White v. Napoleon, 897 F.2d 103, 110 (3 Cir. 1990) (If a plaintiff's disagreement with a doctor's professional judgment does not state a violation of the Eighth Amendment, then certainly no claim is stated when a _doctor_ disagrees with the professional judgment of another doctor); Fulmore v. Mamis, No. 00 Civ. 2831(AJP), 2001 WL 417119, at *9 (S.D.N.Y. Apr. 23, 2001) (noting that the courts have repeatedly dismissed claims based on the refusal of prison doctors to order certain testing procedures, such as a CAT scan or an MRI, because such claims do not state a violation of the Eighth Amendment) (collecting cases).

Plaintiff's other medical exhibits, including documentation from an April 18, 2001 examination by another doctor (Schumacher) who found that Enriquez's symptoms had worsened [Schumacher at that time found that Enriquez had "trouble with gait" and "impaired sensation"] which led that physician (Schumacher) to determine that an MRI was appropriate; the taking of an MRI on May 3, 2001, a July 11, 2001 followup visit which Schumacher to evaluate the test results, and performance of surgery on 7/26/01 while Plaintiff was assigned to the FCCC as a civil detainee, do not render the evaluations, diagnosis, and care provided by Liangco & Schocoff constitutionally deficient. As noted, supra, even, if assuming arguendo, the defendant physicians could be said to have been negligent for not ordering an MRI in December 2000, that would, at most, possibly support a state tort claim of medical malpractice.

As the Eleventh Circuit has noted post-Farmer, even proof that the defendant should have perceived the risk, but did not, is insufficient. Campbell v. Sikes, 169 F.3d 1353, 1364 (11 Cir. 1999) Campbell supra, at 1364 (citing Farmer v. Brennan, 511 U.S. 825, 838 (1994); Cottrell v. Caldwell, 85 F.3d 1480, 1491 (11 Cir. 1996) (the official must have a subjectively "'sufficiently culpable state of mind,'" and "[t]here is no liability for 'an official's failure to alleviate a significant risk that he should have perceived but did not...'") (quoting Farmer, supra, 511 U.S. at 834, 838). Liability may be imposed for deliberate indifference only if the plaintiff proves the defendant actually knew of "an excessive risk to inmate health or safety" and disregarded that risk." Campbell, supra, at 1364 (citing Farmer, at 837).

Here, the record is devoid of evidence showing that the defendant physicians Liangco and Schocoff perceived that their chosen course of diagnosis and treatment (physical examination, and provision of pain medication, and reasoned determination that an MRI was not then necessary) posed a risk of harm to the plaintiff, if they did not choose a different course.

## C.  **Retaliation**

18

Claims of retaliation by prison officials, including retaliation against an inmate for exercising the right of free speech, or filing lawsuits or administrative grievances, are cognizable in a civil rights suit for damages. Thomas v. Evans, 880 F.2d 1235, 1242 (11 Cir. 1989) (First Amendment forbids retaliation prisoners for exercising right of free speech); Adams v. Wainwright, 875 F.2d l536 (11 Cir. 1989) (retaliation for filing lawsuits); Wildberger v. Bracknell, 869 F.2d 1467 (11 Cir. 1989) (retaliation for filing administrative grievances).

In the "free world" context, an act taken in retaliation for exercise of a constitutionally protected right is actionable under §1983 even if the act, when taken for different reasons, would have been proper. Adams v. James, 797 F.Supp. 940, 948 (M.D.Fla. 1992) (citing Mount Healthy City School Dist. Bd. of Education v. Doyle, 429 U.S. 274, 283 (1977). A claim of retaliation is a question of causation, and the test applied in the "free world" context is a "but for" analysis. Adams v. James, supra, 797 F.Supp. at 948.  See Mount Healthy City School Dist. Bd. of Education v. Doyle, 429 U.S. 274 (1977) ("but for" the retaliatory motive, the incidents to which the plaintiff refers would not have taken place). In the prison context at least one Circuit has applied the "but for" standard to inmate claims of retaliation. See McDonald v. Hall, 610 F.2d 16, 18 (1 Cir. 1979). The Eleventh Circuit, however, has declined to follow the "but for" analysis in the context of prisoner retaliation suits "to the extent that the 'but for' test places a greater burden of proof on the inmate." Adams v. Wainwright, supra, 875 F.2d at 1537; Adams v. James, supra, 797 F.Supp. at 948. Instead, the analysis applied in this Circuit to a prisoner retaliation claim requires a "mutual accommodation" between the penal institution's legitimate needs and goals and the prisoner's retained constitutional rights, under the "reasonableness" test set forth in Turner v. Safley, 482 U.S. 78 (1987). Adams v. James, supra, at 948.

A prisoner retaliation claim must be factual, and mere conclusory allegations of unconstitutional retaliation will not suffice. Adams, supra, 797 F.Supp. at 948 (citing Frazier v. Dubois,

922 F.2d 560, 562 n. 1 (10 Cir. 1990). <u>See</u> <u>Cooper v. Ellsworth</u> <u>Correctional Work Facility</u>, 817 F.Supp. 84, 86 (D.Kan.), <u>aff'd</u>, 2 F.3d 1160 (10 Cir. 1993), and cases cited therein. Upon consideration of a motion for summary judgment, mere verification of a party's own conclusory allegations is not sufficient to oppose the motion for summary judgment, <u>Adams v. James</u>, 797 F.Supp. 940, 944 (M.D.Fla. 1992) (citing <u>Fed.R.Civ.P.</u> 56(e); and <u>Fullman v.</u> <u>Graddick</u>, 739 F.2d 553, 557 (11 Cir. 1984)).

Here, plaintiff's allegations in his initial pleadings, claiming that because he filed a state lawsuit against Belmonte [his former girlfriend], and claiming that on August 25, 2000, defendant Phillips, after empathizing with Belmonte on the telephone, verbally abused and threatened the plaintiff [allegedly stating: "get the fuck out of my office, or I'll lock your ass up, you fucking piece of shit sexual predator"], do not in suffice to establish a claim of retaliation. Such verbal abuse, alone, does not rise to the level of a constitutional violation.[14] Nor does it appear that the allegations in the amended pleadings (DE#s 60 and 129), through which plaintiff apparently attempts to link his retention on RR Status from December 22, 2000 to January 15, 2001, to the filing of his lawsuit against Belmonte, and his August 25, 2000 encounter with Phillips in her office, suffice to establish a claim of retaliation against Phillips. Apart from plaintiff's implication that, generally, Phillips did not like him, there is nothing factual to suggest a causal connection between his suit against Belmonte, Phillips' alleged verbal abuse of him on August 25, 2000, and the events of four months later, during which he was placed and retained

---

[14]    Verbal harassment, without more, does not state a claim for relief under §1983. <u>See</u> <u>Hoptowit v. Ray</u>, 682 F.2d 1237, 1252 (9 Cir. 1982)(federal court cannot order guards to refrain from using racial slurs to harass prisoners); <u>Burton v. Livingston</u>, 791 F.2d 97, 101 n. 1 (8 Cir. 1986)(use of racial slurs in prison does not offend Constitution); <u>McFadden v. Lucas</u>, 713 F.2d 143, 146 (5 Cir.), <u>cert. denied</u>, 464 U.S. 998 (1983) (threatening language and gestures).  There are, however, recognized exceptions to the general rule, under which the conduct may rise to the level of a constitutional deprivation: for example, when verbal threats are accompanied by physical force or the present ability to effectuate the threat, <u>Harris v. Lord</u>, 957 F.Supp. 471, 475 (S.D.N.Y. 1997); <u>Jermosen v. Coughlin</u>, 878 F.Supp. 444, 449 (N.D.N.Y. 1995), or the person to whom the verbal abuse is directed is terrorized by threats accompanied by racial slurs, <u>Hopson v. Frederickson</u>, 961 F.2d 1374, 1378-79 (8 Cir. 1992); <u>Burton v. Livingston</u>, 791 F.2d 97 (8 Cir. 1986).

for 24 days on RR status, commencing December 22, 2000.

### D.  Alleged Confinement Without Due Process

As noted supra, the second amended complaint appears to raise a claim of alleged confinement without Due Process against defendant officers ALLEN and COLEMAN, based on alleged "punitive segregation" of plaintiff Enriquez [Room Restriction Status or "RR Status"] on December 22, 2000; and a claim of alleged confinement without Due Process against officer PHILLIPS, based on plaintiff Enriquez's continuation on RR Status for 24 days, from December 22, 2000, until January 15, 2001.

In addition to the "Report of Room Restriction" previously discussed, copies of "Detainee Request/Complaint" forms submitted by Enriquez, and Responses by Major Phillips, reflect further upon the nature of Enriquez's post use of force confinement, and his continuation on that status. In her 12/23/00 RESPONSE to an earlier request by Enriquez to let detainee Sherman room with him, Phillps wrote: "As of this date 12-23-00 you are on Room Restriction Status and I am unable to accommodate this move." In her 12/28/00 RESPONSE to Enriquez's 12/26/00 Request for clarification as to whether he was being charged with any felony, and whether he was to be transferred to the FCCC on or about December 27, 2000, Phillips wrote, as follows:

> You caused an incident in the unit which resulted in the use of chemical agents being applied to your person. Since then you have continuously either beat upon your room door or been abusive to staff. You are out of control. No outside charges are pending against you. You will remain where you are until your behavior no longer presents a security risk to this unit.

(DE# 175-1, at p. 15 of 61).

Plaintiff Enriquez has tried to couch his RR confinement as being punitive, and implies that he was denied witnesses for a dis-

ciplinary proceeding. The record, however, indicates that his place-
ment on confinement on 12/22 was not "disciplinary confinement" as
punishment [as may occur in county jail or state prison, after issu-
ance of a Disciplinary Report (or "DR") for a jail/prison Rule in-
fraction, and confinement for a prescribed period after a discipli-
nary hearing if the hearing team finds an inmate guilty of the
charge lodged against him]. Rather, Enriquez's confinement was room
restriction imposed temporarily for reasons of institutional order
and security, not punishment, and Enriquez's continuation on RR
Status...through the time of his 12/26 "Request/Complaint" which was
answered 12/28, and apparently thereafter until 1/15/01, was for
security reasons.

As noted _supra_, the defendants in their renewed summary judg-
ment motion (DE#217) have not addressed these due process claims.
It is not clear from the record what administrative procedures may
have been in place for use in relation to this confinement of the
detainee/plaintiff Enriquez at South Bay/SBDU, apart from the
grievance process (i.e., the use of Inquiry/Complaint forms).

While, under the Due Process Clause, a pretrial detainee may
not be punished before adjudication of guilt in accordance with due
process of law, _see_ _Bell v. Wolfish_, _supra_, 441 U.S. at 535; and
civil detainees are due a higher standard of care than persons
criminally committed, _Youngberg v. Romero_, _supra_, 457 U.S. at 321-
22, residents at a civil commitment center [such as the South Bay
SBDU] are nonetheless subject to institutional regulations, _see_
_Watson v. Lane_, No. 2:06-cv-17-FtM-29DNF, 2009 WL 789891, at *4
(M.D.Fla. March 23, 2009); _Despart v. Budz_, No. 2:08-cv-729-FtM-
29DNF, 2008 WL 4791888, at *2-3 (M.D.Fla., Oct.29, 2008). Whether
a restriction is incident to a legitimate governmental purpose or
is imposed as punishment, is determinative of whether that
particular restriction amounts to punishment under the Due Process
Clause. _Despart_, _supra_ at *3 (citing _Bell_, _supra_, 441 U.S. at 538).
Absent an institution's expressed intent to punish a detainee, this
determination "generally will turn on whether there is an
alternative purpose rationally connected to the restriction," and

whether the restriction appears excessive based on the alternative purpose supporting it." Id. In other words, if a condition or restriction is "reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment." Id. (quoting Bell, supra, at 539-40). Alternatively, if it "is not reasonably related to a legitimate goal - if it is arbitrary or purposeless - a court may infer that the purpose" is punishment. Id. (quoting Bell, supra, at 539).

Since Enriquez's placement on RR (room restriction) on 12/22/00 and his relatively brief retention on that status until 1/15/01 was akin to administrative confinement for reasons of institutional order and security, and not confinement pending adjudication on charges of institutional rule infractions, as occurs when a DR is issued in jail or prison, it is apparent that the procedural due process protections contemplated under Wolff v. McDonnell, 418 U.S. 539, 556 (1974) for inmates facing prison disciplinary charges and confinement,[15] do not apply here, as Enriquez has argued. The record also indicates that the placement of Enriquez on temporary RR status was for a legitimate governmental goal of maintaining order and security, and not punishment.

It appears that plaintiff Enriquez was afforded due process insofar as he had available to him and did make use of an institu-tional grievance procedure in connection with his RR status. The available administrative procedure rendered available to him the ability to question or challenge his confinement, and the 12/28/00 Response to his 12/16/00 grievance/inquiry provided him notice of the reason for his placement on RR status. Cf Hewitt v. Helms, 459 U.S. 460, 472 (1983)(to conform with the Fourteenth Amendment's pro-cedural due process protections, officials transferring an inmate to some sort of administrative confinement are obligated to engage only in an informal, nonadversary review of the information support-

---

[15]     In 1974, in Wolff, the Supreme Court enunciated the minimal proce-dural due process protections which are to be afforded to a prisoner in prison disciplinary proceedings: 1) advance written notice of the claimed violation; 2) a written statement of the fact finders as to the evidence relied upon and the reasons for the disciplinary action taken; and 3) opportunity to call wit-nesses and present documentary evidence in defense, unless this would be undu-ly hazardous to institutional safety or correctional goals. Id., at 563-66.

ing [the inmate's] administrative confinement, including whatever statement [the inmate] wished to submit, within a reasonable time after confining him to administrative confinement). Moreover, it appears that Enriquez's retention on RR status for 24 days was a sufficiently short period that it would not implicate due process. Cf Rogers v. Singletary, 142 F.3d 1252, 1252-53 (11 Cir. 1998), (holding that where an inmate was assigned to Administrative Confinement pending resolution of a disciplinary report, and thereafter was continued on AC pending resolution of related criminal charges, the inmate failed to show he was deprived of a constitutionally protected liberty interest, as defined in Sandin v. Conner, 515 U.S. 472 (1995), where the total length of his AC confinement was approximately 2 months). Finally, it appears that Enriquez himself had a measure of control over the length of his confinement on RR status. He was told the reason for his continued retention on RR status (i.e. that after the 12/22 incident which resulted in use of a chemical agent against him, he had "continuously either beat upon" his room door, or had "been abusive to staff"), and he was told how long he would have to remain on RR status (he was told he was "out of control" and informed "you will remain where you are until your behavior no longer presents a security risk to this unit"). Cf Marsh v. Department of Children and Families, et al., No. 2:03-cv-162-FtM-29SPC, 2006 WL 2474019, at *7-8 (M.D.Fla., Aug.25, 2006)(citing Sandin v. Conner and Youngberg v. Romero)(holding that placement of a detainee in secure management confinement at Florida's FCCC for 45 days, for participating in a disturbance and refusing orders to go to his room, did not violate due process; noting that the detainee "held the 'keys' to his confinement," where he was told how long he would remain in confinement, was told that he would be required to participate in programs that would address his conduct and require him to take responsibility for his past conduct, and noting that he was evaluated each day). Compare: Williams v. Fountain, 77 F.3d 372, 374 n. 3 (11 Cir.1996), in which the Eleventh Circuit, applying Sandin, determined that confinement of an inmate [not a civil detainee] for 12 months in solitary confinement represented an "atypical and significant hardship...in relation to the ordinary incidents of prison life," so as to entitle him to due process.

24

In sum, where detainee Enriquez had access to an administrative grievance process to voice his complaint(s) regarding his confinement status, where he was advised of the reason he was initially placed on RR status, where he was advised why he was retained on RR status and what it would take for him to be released [modification of behavior that was disruptive and presented a security risk on the unit], and where his 24 day confinement on RR status was relatively short, it is apparent that he was not deprived of due process, either with respect to his initial or continued placement on RR [room restriction] status.

### III      CONCLUSION

It is therefore recommended that: 1) as to all defendants and all claims, the defendants' joint renewed motion for summary judgment (DE#217) be GRANTED; and 2) this case be closed.

Objections to this report may be filed with the District Judge within fourteen days of receipt of a copy of the report.

Dated: January 21st, 2010.

_____
UNITED STATES MAGISTRATE JUDGE

cc:  Frank Rafael Enriquez, Pro Se
     No. 990088
     Florida Civil Commitment Center
     13613 S.E. Highway 70
     Arcadia, FL 34266-7829

     Gregory A. Kummerlen, Esquire
     Farrah Christina Fugett-Mullen, Esq.
     Wiederhold, Moses & Rubin, P.A.
     Suite 240
     560 Village Boulevard
     West Palm Beach, FL 33409

25

Bruce R. Katzell, Esq.
Steinger, Iscoe & Phillips
1645 Palm Beach Lakes Blvd.
Suite 900
West Palm Beach, FL 33401-2204